1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **MARK MAHON,** | **Case No.: 4:20-cv-01523-YGR** |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **MAINSAIL LLC, ET AL.,** | |
| Defendants. | |
| **MARK MAHON,** | **Case No.: 4:20-cv-01525-YGR** |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **YOUTUBE LLC, ET AL.,** | |
| Defendants. | |
| **MARK MAHON,** | **Case No.: 4:20-cv-01534-YGR** |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **APPLE INC., ET AL.,** | |
| Defendants. | |

*Pro se* plaintiff Mark Mahon brings claims for copyright infringement, counterfeit labeling, fraud, and conversion against defendants related to the motion picture and screenplay titled *Strength and Honour* (the "Film").  (Dkt. No. 53 in Case No. 20-1523, Third Amended Complaint ("TAC").[1]  After two omnibus orders regarding motions to dismiss, the list of defendants has been

---

[1] Unless otherwise specified, the Court references the docket with the lowest filing number. *See Mahon v. Mainsail LLC*, No. 20-cv-01523.  Where appropriate, the Court directly references the other cases by number.  *See Mahon v. YouTube LLC*, No. 20-cv-1525; *Mahon v. Apple Inc.*, No. 20-1534.

United States District Court
Northern District of California

narrowed to three – Mainsail,[2] Apple, and YouTube.  (*See* Dkt. Nos. 44, 52.)  Plaintiff alleges that Mainsail defendants wrongfully distributed physical and digital copies of the Film, and that YouTube and Apple distributed digital copies of the Film without a license.  Plaintiff moves for summary judgment on claims that the Mainsail defendants are liable for copyright infringement, trafficking in counterfeit labels, omission fraud, and conversion.  (Dkt. No. 119 at 1.)  He also moves for summary judgment on claims that YouTube and Apple are liable for copyright infringement.  All defendants move for summary judgment on grounds that they are not liable for the above claims.[3]

Having carefully considered the parties' briefing, the admissible evidence, the record in this case, the reasons set forth below, and upon further consideration after the February 16, 2024, hearing, and supplemental briefing,[4] the Court **GRANTS** defendants' motions for summary judgment and **DENIES** plaintiff's motions for summary judgment.

I.      BACKGROUND

A.  Factual Background

Plaintiff, with his production company Maron Pictures, created the Film over the course of several years.[5]  On August 6, 2009, "Maron Pictures," not plaintiff, registered a copyright in the Film.[6]

---

[2] The Mainsail defendants include Mainsail LLC, Shoreline Entertainment, Inc., Sam Eigen, Morris Ruskin, and Does 1 through 21 (collectively, "Mainsail").

[3] Apple and YouTube move to seal several documents referenced in the briefing and plaintiff objects to their motions to seal.  (Dkt. Nos. 153, 154, 155, 165, 168, 175 of Case No. 20-cv-01525; and 138, 139, 140, 143, 146, 152, 159 of Case No. 20-cv-01534.)  The motions to seal are **GRANTED** except as used in this Order.

[4] In response to the supplemental briefs, the parties filed multiple objections and motions for leave to file motions to strike.  The Court has noted all objections and hereby **DENIES** all motions for leave to strike.

[5] Dkt. No. 122-1, Defendant's Responsive Separate Statement, ("DRSS") at 2, 7, 10, 12.

[6] Dkt. No. 166-44 of Case No. 20-cv-1525, Plaintiff's Responsive Separate Statement to YouTube ("YouTube PRSS"), at 4; 148-6 of Case No. 20-cv-1525.)  Maron Pictures was listed as

United States District Court
Northern District of California

1    Prior to that date, on April 27, 2009, plaintiff signed on behalf of Maron Pictures a sales

2 agency agreement (the "SAA") granting Mainsail "the sole and exclusive right, license, and

3 privilege to license and distribute" the Film.[7]  The agreement included a provision allowing

4 distribution throughout "the entire world, excluding North America and Ireland."  (DRSS at 15;

5 Dkt. No. 118-3, Ex. B at 1.)

6    In May 2009, however, the parties emailed each other regarding distribution rights in

7 Ireland as part of a distribution deal with sublicensee Entertainment One.  Defendants argue that

8 these emails demonstrate a modification to the agreement allowing for distribution in Ireland.  (*See*

9 Dkt. No. 122 at 7; Dkt. No. 164 of Case No. 20-cv-1525 at 14.)  On May 14, 2009, defendant Eigen

10 emailed plaintiff to confirm that plaintiff "gave [Eigen] the go ahead" to "close terms" on a

11 "UK/Ireland offer for all rights @100,000."  (YouTube PRSS at 10.)  Plaintiff responded later that

12 day, writing: "That is great, thanks."  (*Id.* at 12.)  On May 16, Eigen confirmed the deal in another

13 email to plaintiff, stating that Eigen's company "sold Mark Mahon's STRENGTH & HONOUR to

14 E1 Entertainment for UK and Eire."  (*Id.* at 13.)

15    In January 2010, the Film was released in the Republic of Ireland.  (DRSS at 23.)  On

16 January 30, 2010, plaintiff sent a case and desist letter to the Mainsail defendants instructing them

17 to cease distributing the Film and to remove the cover images and trailer that were being used to

18 market the Film.  (*Id.* at 24.)  Plaintiff sent multiple follow-up communications to Mainsail and its

19 sublicensee, Entertainment One, attempting to stop distribution.  (*See id.* at 25-28.)  Plaintiff then

20 pursued litigation in California state court in 2013.  *See infra* Part I.B.

21    On October 1, 2015, plaintiff cancelled the copyright licensing agreement between himself

22 and his company, Maron Pictures, purportedly severing the licensing chain below.  (PRSS at 42.)

23    Mark Mahon → Maron Pictures → Mainsail → Entertainment One → Apple and YouTube

24

25

26 the author and copyright claimant on the registration, though plaintiff now maintains that this was a
filing error.  (YouTube PRSS at 5.)

27

28    [7] Dkt. No. 121-84, Plaintiff's Responsive Separate Statement ("PRSS") at 5; DRSS at 15;
YouTube PRSS at 7; 118-3, Ex. B at ¶ 1.

3

United States District Court
Northern District of California

Shortly thereafter, an attorney representing plaintiff and Maron Pictures sent a letter to Mainsail terminating the licensing agreement between Maron Pictures and Mainsail.  (*Id.* at 43; Dkt. No. 118-7, Ex. JJ.)  Notably, the licensing agreement contained a survival clause allowing Mainsail to "complete deals already in place at the time when the term is ended (Existing Deals). . . . Sales Agent shall be entitled to receive, on a continuing basis, any sales commission generated from any Existing Deals."  (YouTube PRSS at 9; Dkt. No. 118-3, Ex. B at ¶ 2.5.)  Also, the copyright registration for the Film listed Maron Pictures, not Mark Mahon, as the author and claimant of the Film.  (YouTube PRSS at 5; Dkt. No. 148-6 of Case No. 20-cv-1525.)  In 2017, plaintiff filed a supplementary copyright application with the Copyright Office changing the author and claimant from Maron Pictures to Mark Mahon.  He claimed that he did so to correct a filing error (YouTube PRSS at 53), although defendants dispute this.  (*See* Dkt. No. 122 at 16:25-26.)

In February 2018, Maron Pictures unexpectedly received an email from Entertainment One displaying revenue for the Film along with the words "Shoreline Entertainment."  (DRSS at 45.)  Plaintiff argues that this email presents new evidence that the Mainsail defendants, which include Shoreline Entertainment, made revenue from the Film despite representations to the contrary by Mainsail and its representatives.  (Dkt. No. 119 at 6:12-13; DRSS at 41, 45.)

In early 2019, plaintiff purchased the Film from YouTube and plaintiff's friend purchased a copy from Apple.  (DRSS at 46, 48.)  In December 2019, plaintiff contacted the defendants for the first time, demanding the removal of the Film from their platforms.  (Dkt. No. 151 in Case No. 20-cv-1534 ("Apple PRSS") at p.6; YouTube PRSS at 44.)  YouTube and Apple informed plaintiff that the Film had already been removed from YouTube in March 2019, pursuant to instructions from Entertainment One, and from Apple's iTunes service in May 2019.  (Apple PRSS at p.6; YouTube PRSS at 28.)

In December 2019, Visual Data, a third party to which plaintiff sent Film materials for processing in 2009, sent plaintiff a chart displaying data about the whereabouts of various assets, including two DVD copies that plaintiff argues are film masters.  (DRSS at 17, 49.)  The chart shows the two copies at issue being sent to Mainsail's office in 2017.  (*Id.* at 50.)  Plaintiff argues that this chart shows new, non-time-barred, evidence that "Visual Data had copied" the "Film on

1  Mainsail's direct instruction and distributed these counterfeit copies to companies all over the

2  world." (Dkt. No. 119 at 6:20-21.)

3       **B. Procedural Background**

4       Plaintiff, through his production company Maron Pictures, of which he is the 100% owner

5  (DRSS at 10), sued Mainsail in California superior court in March 2013. (*Id.* at 34.) In 2016, that

6  court found in favor of Mainsail, ruling, among other things, that Maron Pictures was not entitled to

7  terminate its agreement with Mainsail and was not entitled to an accounting. *See Maron Pictures*

8  *Ltd. v. Eigen*, No. B280738, 2019 WL 642871, at *1 (Cal. Ct. App. Feb. 15, 2019). In 2019, the

9  California Court of Appeal affirmed. *Id.* The California Supreme Court then denied certiorari.

10 *Maron Pictures Ltd. v. Eigen*, 140 S. Ct. 516, (2019).

11      Plaintiff then brought this dispute to the federal courts, alleging copyright and related claims

12 that are separate from those raised in state court, though they stem from the same agreement

13 analyzed by the California courts. (*Compare* TAC at ¶ 27 *with Maron Pictures Ltd.* 2019 WL

14 642871, at *1.)

15      Over the course of significant discovery and two orders on motions to dismiss, this Court

16 allowed some limited claims to proceed,[8] noting the following:

- Plaintiff's **copyright claims** can proceed under the (a) discovery rule (described as "when a party discovers, or reasonably should have discovered, the alleged infringement" *Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1022 (9th Cir. 2019)) and (b) separate accrual rule (stating "[e]ach time an infringing work is reproduced or distributed" and "[e]ach wrong gives rise to a discrete 'claim' that 'accrues at the time the wrong occurs.'" *Id.* The Court noted that plaintiff may bring a claim for violations described in Visual Data's 2019 report and any other new infringement he uncovers via discovery. (Dkt. No. 44 at 8-9.)

- Plaintiff's **counterfeit label trafficking claims** must allege, in good faith, that Mainsail possessed or transferred counterfeit labels within the [statute of limitations period], (denying prior claims that defendants trafficked in counterfeit labels dating back to 2010.) (Dkt. No. 52 at 10.)

---

[8] In plaintiff's operative complaint against Mainsail, claim 1 is for copyright infringement. (TAC ¶¶ 72-81.) Claim 2 is for trafficking in counterfeit labels. (*Id.* ¶¶ 83-90.) Claim 3 is for fraud. (*Id.* ¶¶ 92-100.) Claim 4 is for conversion. (*Id.* at ¶¶ 102-108.) The only claim against the other two defendants is for copyright infringement.

- Plaintiff's **fraud claims** can proceed under theories of omission fraud, stating "[i]n these circumstances, Mainsail's nondisclosure of its instruction to Visual Data to send it master copies of the Film in 2017 plausibly constitutes an actionable omission because Mainsail had a contractual duty to pay Mahon revenues from its activities and concealed facts that would have shown its failure to do so.  (Dkt. No. 52 at 13.)

- Plaintiff's California law **conversion claim** can proceed if he can show evidence that Mainsail obtained master copies of the Film in 2017 without returning them. The Court noted that conversion claims based solely on the conversion of intangible property (copyrights) are preempted.  (Dkt. No. 52 at 14.)

As the Court previously noted, plaintiff's claims are subject to a three-year statute of limitations.[9] (Dkt. No. 44 at 8, 15-17; Dkt. No. 52 at 9.)  Plaintiff filed suit against all defendants on March 2, 2020.  Therefore, the operative date for the three-year statute of limitations period is March 2, 2017.

## II.      LEGAL STANDARD

### A. Procedural Framework

A party may move for summary judgment on a "claim or defense."  Fed. R. Civ. P. 56(a). As a general matter, where the party moving for summary judgment would bear the burden of proof at trial, it bears the initial burden of proof at summary judgment as to each material fact and must show that no reasonable jury could find other than for the moving party.  *See S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (internal citation omitted).  Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To determine if this is so, the court must view all evidence in the light most favorable to the nonmoving party and draw all justified inferences on its behalf.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits."  *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (alternation and internal quotation marks omitted).  Thus, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each

---

[9] Though the Court's prior orders do not specify, the California statute of limitations period for conversion is three years as well.  *Strasberg v. Odyssey Group, Inc.* (1996) 51 Cal.App.4th 906, 915 (citing Cal. Civ. Proc. Code § 338(c)).

side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id.* (quoting WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720, at 335-36 (3d. ed. 1998)).  If, however, the cross-motions are before the court at the same time, the court must consider the evidence proffered by both sets of motions before ruling on either one.  *Id.* at 1135-36.

**B. Liability Framework**

*1. Copyright Infringement – all defendants*

Plaintiff alleges that the Mainsail defendants committed direct, contributory, and vicarious copyright infringement.  With respect to the complaints against YouTube and Apple, he alleges that each committed direct and contributory infringement.

"To prevail on a claim of direct copyright infringement," a party "must establish ownership of the allegedly infringed material" and that the alleged infringer "violated at least one exclusive right" granted to it under 17 U.S.C. § 106.  *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019) (cleaned up).  "Contributory liability requires that a party (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement.  *Id.* at 745 (cleaned up).  To prevail on a vicarious liability claim, "[plaintiff] must prove [defendant] has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity."  *Id.* at 746 (cleaned up).

*2. Counterfeit Labels – Mainsail only*

Plaintiff brings claims that Mainsail trafficked in counterfeit and illicit labels for the Film. The Anti-Counterfeiting Act, codified as 18 U.S.C. § 2318, prohibits trafficking of "counterfeit" and "illicit" labels. 18 U.S.C. § 2318(a)(1).  A "counterfeit label" means "an identifying label or container that appears to be genuine, but is not."  18 U.S.C. § 2318(b)(1).  An "illicit label" means a labeling component that is "used by the copyright owner to verify that [the work] is not counterfeit or infringing" and that is used without authorization to distribute another work or else the same work in greater quantities or to more users than authorized.  18 U.S.C. § 2318(b)(4).

*3. Fraud by Omission – Mainsail only*

With respect to the claims for fraud or deceit based on concealment under California law, plaintiff must allege that (1) the defendant (a) concealed or suppressed a material fact, (b) was

United States District Court
Northern District of California

1  under a duty to disclose the fact to the plaintiff, and (c) intentionally concealed or suppressed the

2  fact with the intent to defraud the plaintiff, (2) the plaintiff must have been unaware of the fact and

3  would not have acted as he did if he had known of the concealed or suppressed fact, and (3) as a

4  result of the concealment or suppression of fact, the plaintiff sustained damage.[10]  *Boschma v.*

5  *Home Loan Ctr., Inc.*, 198 Cal. App. 4th 230, 248 (2011).

6          *4.  Conversion – Mainsail only*

7        Finally, with respect to the conversion claim under California law, the elements of

8  conversion are (1) the plaintiff's ownership or right to possession of the property; (2) the

9  defendant's conversion by wrongful act inconsistent with the property rights of the plaintiff; and (3)

10  damages.  *In re Emery*, 317 F.3d 1064, 1069 (9th Cir. 2003).

11  **III.    ANALYSIS**

12      **A.  Plaintiff's License-Based Claims for Copyright Infringement and Counterfeiting**

13        Plaintiff alleges that Mainsail infringed his copyright by, among other things, licensing the

14  film to Entertainment One for distribution in Ireland.  (Dkt. No. 119 at 14-20.)  Plaintiff also brings

15  claims that the Film's distribution included counterfeit labels.  (*Id.* at 19.)  Plaintiff's claims against

16  YouTube and Apple rest solely on he and his friend's purchases of the Film in Ireland.  (*See* Dkt.

17  No. 146 in Case No. 20-cv-1525 at 7; Dkt. No. 136 in Case No. 20-cv-1534 at 7.)  The defendants

18  move to dismiss plaintiff's claims on grounds that a valid license existed permitting the sale of the

19  Film in Ireland.  The Court analyzes this defense.

20        First, the Court finds no dispute that Maron Pictures and Mainsail entered an agreement

21  granting "the sole and exclusive right, license, and privilege to license and distribute" the Film to

22  defendant Mainsail.  (Dkt. No. 121-84, Plaintiff's Responsive Separate Statement ("PRSS") at 5;

23  DRSS at 15; YouTube PRSS at 7.)  Although the agreement initially included a provision allowing

24  distribution throughout "the entire world, excluding North America and Ireland" (DRSS at 15), the

---

27         [10] An alternative formulation for fraud under California law requires plaintiff to allege "(a)

28  a misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity
(or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting
damage." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009).

United States District Court
Northern District of California

1  Court finds that the parties later modified the agreement to allow for the Film's distribution in
2  Ireland.

3  On May 14, 2009, plaintiff received an email from defendant Eigen confirming that plaintiff
4  "gave [Eigen] the go ahead" to "close terms" on a "UK/Ireland offer for all rights @100,000."
5  (YouTube PRSS at 10.)  Plaintiff responded: "That is great, thanks."  (*Id.* at 12.)  He confirmed in
6  his deposition that this "UK/Ireland offer" was the Entertainment One offer.  (*Id.* at 11.)  Then, on
7  May 16, plaintiff authorized Mainsail to enter a Distribution License Agreement granting
8  Entertainment One's UK entity a license to distribute the Film in the U.K and Ireland.  (*Id.* at 13.).
9  That same day, Mainsail and Entertainment One entered the Distribution License Agreement.  (*Id.*
10 at 15.)  Eigen also informed plaintiff on May 16 that Mainsail sold S&H to eOne UK "for UK and
11 Eire." (*Id.* at 13.)  Plaintiff responded the next day, and confirmed he had "giv[en] authorization" to
12 Mainsail on May 16 "to close the deal with [Entertainment One]."  (*Id.* at 14.)

13 Plaintiff thereafter continued to acknowledge that Entertainment One's license validly
14 covered distribution rights in Ireland.  On September 28, 2009, Mahon asked an Entertainment One
15 affiliate to confirm when eOne would begin distributing S&H in Ireland, stating "I had a
16 conference call with my Executive Producer . . . who told me that I wasn't to release the high res.
17 Key art until we are given the dates for U.K. and Ireland (dvd) . . . ."  (Dkt. No 164-6 of Case No.
18 20-1525 at 65.)  Further, in December 2009, plaintiff emailed Eigen stating that he was in a store in
19 Ireland and asked Eigen why he wasn't seeing advertising for the Film.  (Dkt. No. 122-3, Ex.
20 EEE).[11]

21 Plaintiff asserts two arguments, neither of which persuade.  Plaintiff's only factual rebuttal
22 regarding a modification to sell in Ireland is an unsupported statement that "Ireland" and "Eire" in

23 _____

24 [11] The record is replete with evidence mentioning the Film's sales and distribution in
   "Ireland" and "Eire," without any corrections or clarifications of "Northern Ireland."  The Court
25 need not credit plaintiff's self-serving declaration to the contrary.  *See Hansen v. United States,*
   7 F.3d 137, 138 (9th Cir. 1993) ("When the nonmoving party relies only on its own affidavits to
26 oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to
   create an issue of material fact.").  (*See* PRSS at Additional Fact 16 stating "Maron Pictures made
27 clear it was prepared to overlook the unauthorized Republic of Ireland release," whereas the
   evidence states plaintiff "want[s] to correct the DVD release in Ireland, and is willing to pay the
28 cost of that including changing the art work," citing Dkt. No. 121-26.)

the above communications referenced Northern Ireland, and not the Republic of Ireland.  (Dkt. No 121 at 3.)  Plaintiff presents no evidence at all that anyone understood the agreement to affect Northern Ireland, and the communications above demonstrate an intention for the agreement to allow distribution in the Republic of Ireland.  Therefore, no reasonable jury could find other than for the defendants on this issue.

Plaintiff also argues that defendants have no license to the Film because he revoked the license from himself to his production company, Maron Pictures, thereby severing the chain of licenses from Maron Pictures to Mainsail, and subsequently Apple and YouTube.  Defendants argue plaintiff should be judicially estopped from making such arguments.  Previously, Maron Pictures sued Mainsail and represented to the state court that it owned the copyright.  Now, after having lost his state court case, plaintiff attempts to claim that Maron Pictures' ownership was a mistake and he himself owned the copyright, thus suing in his personal capacity.

Judicial estoppel "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (cleaned up).

> Judicial estoppel is an equitable doctrine invoked by a court at its discretion.  In determining whether to apply the doctrine, we typically consider (1) whether a party's later position is clearly inconsistent with its original position; (2) whether the party has successfully persuaded the court of the earlier position; and (3) whether allowing the inconsistent position would allow the party to derive an unfair advantage or impose an unfair detriment on the opposing party.

*United States v. Liquidators of Eur. Fed. Credit Bank*, 630 F.3d 1139, 1148 (9th Cir. 2011) (cleaned up).  The Court considers those factors:

*First*, with respect to whether plaintiff has asserted inconsistent positions, this element is satisfied.  Plaintiff now asserts that he reclaimed the Film's rights on October 1, 2015 and that he therefore "does not recognize any rights that have been unlawfully assigned by others," including the rights he assigned to Mainsail.  (YouTube PRSS at 72; *see id.* 73 (citing Dkt. No. 148-8 in Case No. 20-cv-1525 at 220:22-221:8 ("[O]bviously at any given time in 2016, I could have filed an infringement lawsuit because my rights had reverted back to me.")).  However, in 2016, after plaintiff's alleged revocation, Maron Pictures repeatedly represented to the California state courts

that it (not plaintiff Mahon) owned the rights to the Film.[12]  (YouTube PRSS at 47 (citing declaration to the Superior Court in 2016 in Mahon's name stating that "Maron Pictures owns the rights to" the Film); *id.* at 64-66 (citing Maron Pictures' appellate reply brief representing that *S&H* was Maron Pictures' "intellectual property" and that Maron Pictures remained entitled to invoke the protections of federal copyright laws).

Plaintiff also asserts that he is now the owner of the copyrights because he corrected a "filing error" in the copyright's registration, changing the owner from Maron Pictures to himself, Mark Mahon.  His correction is dubious at best.  On April 24, 2017, while litigating in the California Court of Appeal (*id* at 50-52), plaintiff filed a supplementary application with the Copyright Office.  He asked to change the author from his company, Maron Pictures, to himself individually.  (*Id.* at 53.)  He initially requested "special handling" due to "ongoing litigation" involving whether he or Maron Pictures was the copyright holder of the Film.  (*Id.* at 54.)  Plaintiff later identified the "ongoing litigation" as the state court litigation between Maron Pictures and Mainsail.  (*Id.* at 55.)  On May 16, 2017, the Copyright Office rejected plaintiff's application, stating it was suspending action on the supplementary application until plaintiff informed the Copyright Office that the litigation had been resolved.  (*Id.* at 56-58.)  Plaintiff responded on May 26, 2017: "I can confirm that my dispute with my company, Maron Pictures, has now been resolved."  (*Id.* at 59.)  This statement was false and misleading because there was no litigation between plaintiff and Maron Pictures.  (*Id.* at 60.)  Further, Maron Pictures' state court appeal was not resolved,[13] as it remained active until 2019.  (*Id.* at 62-66.)  After receiving plaintiff's May 26

---

[12] Plaintiff and Maron Pictures' statements are attributable to each other for the purposes of judicial estoppel analysis.  *See Milton H. Greene Archives v. Marilyn Monroe*, 692 F.3d 983, 996 (9th Cir. 2012) (judicial estoppel applies "not only against actual parties to prior litigation, but also against a party that is in privity to a party in a previous litigation") (cleaned up).

[13] Plaintiff notes that he understood the litigation to be over at that juncture.  Even if that was plaintiff's understanding, his statement discussed separate litigation, which did not exist, in a way that likely misled the Copyright Office into changing the registration when it likely would not otherwise do so.  For these reasons, the Court finds reason for estoppel, though it stops short of finding that plaintiff committed fraud on the copyright office as defendants urge.  *See Unicolors v. H&M Hennes & Maruitz*, 52 F.4th 1054, 1064-1067 (9th Cir. 2022).

1   response, the Copyright Office subsequently registered the application, which listed Mahon as the

2   author of the Film.  (*Id.* at 61.)

3       *Second*, with respect to whether plaintiff had successfully persuaded the court of the earlier

4   position, this element is satisfied.  Maron Pictures successfully persuaded the California state courts

5   to adopt its earlier contentions.[14]  The California courts accepted Maron Pictures' previous claim

6   that it owned the rights to the Film after the purported revocation on October 1, 2015.  (*Id.* 49, 63

7   (State court describing Maron Pictures as "the owner" of the Film.)).  In fact, Maron Pictures

8   maintained this position through the end of its litigation to the California appellate court.  (*Id.* at 64-

9   66.)

10      *Third*, with respect to whether allowing plaintiff's inconsistent position would allow the

11  party to derive an unfair advantage or impose an unfair detriment on the opposing party, this

12  element is satisfied.  Plaintiff pursued his state court case as Maron Pictures.  His change-in-course

13  is an explicit attempt to rewrite history and retroactively revoke rights from multiple entities that

14  believed they had such rights.  Such action has "forced [parties] into lengthy litigation" to which

15  they would not otherwise be subject.  *Monroe*, 692 F.3d at 1000.

16      All three elements being satisfied, the Court finds plaintiff is estopped from arguing that he

17  severed the licensing chain to Mainsail and its downstream sublicensees.  This finding "protect[s]

18  the integrity of the judicial process by prohibiting parties from deliberately changing positions

19  according to the exigencies of the moment."  *New Hampshire v. Maine*, 532 U.S. 742, 749-50

20  (2001) (cleaned up).

21      Accordingly, the Court treats the licensing agreement between Maron Pictures and

22  Mainsail, which plaintiff himself signed, as valid for the purposes of this litigation.  Because the

23

24

25  ──────────────

26      [14] Notably, the second prong does not require that the entire prior case be resolved in a
    party's favor. It is sufficient that a court accept the earlier position.  *See Interstate Fire & Cas. v.*
27  *Underwriters at Lloyd's, London*, 139 F.3d 1234, 1239 (9th Cir. 1998) (holding a court's mere
    recitation of a stipulated fact satisfied the second factor, and that a court need not "rel[y] on that
28  fact in its decision.").

*Left margin:* United States District Court  Northern District of California

12

parties agreed to license the Film in Ireland,[15] defendants did not infringe plaintiff's copyright, either directly or vicariously.  The Court finds that there was a valid license agreement permitting such distribution.  Therefore, the Court **GRANTS** YouTube's and Apple's motions in their entirety, and Mainsail's motion as to plaintiff's claims that it unlawfully sublicensed the Film for distribution.

### B.  Plaintiff's Source-Master-Based Copyright, Counterfeiting, Fraud, and Conversion Claims Against Mainsail

Plaintiff alleges that there is new, non-time-barred evidence from 2019 that Mainsail asked Visual data to ship it DVD master copies of the Film in 2017.  This allegation comprises part of plaintiff's copyright, counterfeiting, fraud, and conversion claims against Mainsail.

Specifically, plaintiff argues that in April 2009, he provided master copies of the Film ("source masters") to Mainsail and Visual Data, a California company, for processing pursuant to the agreement between Maron Pictures and Mainsail.  (Dkt. No. 119 at 3.)  He alleges that Mainsail instructed Visual Data to copy the source masters in in California, in violation of the SAA, in 2009, and Mainsail and Visual Data had a contractual relationship preventing Visual Data from disclosing any copying to plaintiff.  (*Id.* at 12-13.)  Plaintiff discovered evidence on December 16, 2019, that Visual Data sent several physical assets to Mainsail in 2017, including two DVDs with bar-codes of 263626 and 263627 (the "626 and 627" copies.)  (*Id.* at 27; DRSS at 50, 58.)

Mainsail scrupulously accounts the history of these DVDs, however, and provides undisputed evidence that, in fact, it made the 626 and 627 copies with plaintiff's permission in 2009, plaintiff was aware of their existence in 2009, and that Visual Data sent them back to Mainsail in 2017 without Mainsail asking them to do so.  Three months before plaintiff delivered the film masters to Visual Data, Mainsail produced on the 626 and 627 copies on their own

---

[15] Plaintiff also argues that Apple and YouTube infringed by transmitting the Film over servers in the U.S.  Even if the Film was copied, stored, or transmitted on U.S. servers during the statute of limitations period, of which plaintiff provides no evidence, the undisputed facts show that Entertainment One, not Apple (Apple PRSS at p. 3-5) or YouTube (YouTube PRSS at 20-24, 27), exercised control over the uploads. Therefore, YouTube and Apple did not perform the requisite volitional conduct in the United States.  *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723 (9th Cir. 2019) ("To demonstrate volitional conduct, a party . . . must provide some evidence showing the alleged infringer exercised control (other than by general operation of its website.") (cleaned up).

1  equipment.  (PRSS at 12.)  The DVDs were created to be used as marketing tools to send to

2  prospective distributors only, for no cost to the distributors.  (*Id.* at 13-16.)  In fact, defendants

3  showed the DVDs' contents, in the form of a trailer, to plaintiff on May 9, 2009, and plaintiff

4  commented on the trailer.  (*Id.* at 21-22.)  Mainsail then sent the DVDs to Visual Data on

5  September 18, 2009, and Visual Data assigned the 626 and 627 barcode numbers to the DVDs.  (*Id.*

6  at 23-24.)  Visual Data then held the copies in their inventory until 2017, and never made copies of

7  the DVDs.  (*Id.* at 25-26.)

8      In 2017, Visual Data asked Mainsail permission to send a delivery of elements that Visual

9  Data had been keeping in storage.  (*Id.* at 58.)  Visual Data did not specifically mention the Film.

10  (*Id.* at 59.)  Mainsail responded that Visual Data could ship it the elements, and Visual Data did so.

11  (*Id.* at 60-61.)  626 and 627 were in the shipment, despite Mainsail never specifically requesting

12  them.  (*Id.* at 63-64.)  Visual Data made no copies after receiving the 626 and 627 copies and there

13  is no evidence of any agreement requiring Visual Data to withhold information from Mahon

14  regarding the Film.  (*Id.* at 67, 76.)  Further, contrary to plaintiff's theory that 626 and 627 contain

15  "clean versions" of the source masters, the 626 and 627 copies do not contain "clean" copies.  (*Id.*

16  27-28.)  Instead, they contain a "dirty" version of the film, with the text "SHORELINE

17  ENTERTAINMENT" overlayed atop the picture (to deter unauthorized copying).  (*Id.* at 29.)

18  Further, the SAA allowed Mainsail to have "full and complete charge and control of the manner in

19  which, and the terms upon which, the [Film] shall be marketed and sold."  (*Id.* at 6; Dkt. No. 118-3,

20  Ex. B.)

21      In response to Mainsail's detailed account of the history of these DVDs, plaintiff argues the

22  following.  Plaintiff "disputes the discs presented in exhibits are the real DVDs that were in the

23  DVD cases with markings 263626 and 263627, which could have simply been changed by putting

24  any disc on the planet in those boxes." (Dkt. No. 121 at 5.)  Next, he implies that it was not

25  possible for Mainsail to create the dirty copies because they "were only initially provided a 35mm

26  film print of the Film," and he "had not finished the sound mix for all the other deliverable formats,

27  including DVD until in or around July 27/28, 2009." (*Id.*)  Plaintiff's arguments are belied by

28  evidence, however, that he was aware that multiple companies had given "screener copies" of the

14

1   Film as of June 5, 2009.  (Dkt. No. 118-5, Ex. P.)  He also knew that Mainsail made a trailer for the

2   Film as of May 9, 2009.  (Dkt. No. 118-4, Ex. O.)  Therefore, it was clearly possible for copies of

3   the Film to be made before July, 2009, contrary to plaintiff's arguments.

4          Therefore, finding no dispute of material fact, the Court finds that (i) 626 and 627 were not

5   source masters, (ii) plaintiff was aware of them in 2009, (iii) Mainsail conducted any copying with

6   plaintiff's knowledge and permission, and (iv) Mainsail did not initiate their return from Visual

7   Data in 2017.

8          Accordingly, the Court **GRANTS** Mainsail's motion for summary judgment as to all claims

9   stemming from the 626 and 627 copies.  Although plaintiff may have had valid concerns that new

10  evidence may have uncovered unauthorized behavior with his Film's masters, the discovery process

11  has served its purpose and revealed that there was no such wrongdoing.

12         **C.  Plaintiff's E1-Email-Based Copyright, Fraud, and Conversion Claims Against**

13             **Mainsail**

14         Finally, plaintiff brings claims that Mainsail continued to receive revenue from the Film

15  despite prior court testimony to the contrary.  Plaintiff argues that around February 14, 2018,

16  Maron Pictures received a random royalty report for the Film from Entertainment One, allegedly

17  showing a balance of GBP £7,815.74 for the Film, due to Shoreline Entertainment.  (DRSS at 45.)

18  Plaintiff argues that this email presents new, non-time-barred, evidence that the Mainsail

19  defendants, which include Shoreline Entertainment, made revenue from the Film despite

20  representations to the contrary by Mainsail and its representatives.  (Dkt. No. 119 at 6; DRSS at 41,

21  45.)  This allegation comprises part of plaintiff's copyright, fraud, and conversion claims against

22  Mainsail.

23         Through discovery, however, plaintiff's theory has not been borne out by the evidence.  In

24  fact, the evidence is undisputed that Mainsail did not receive revenue for the Film.  Mainsail's

25  agreement with Entertainment One required Mainsail to submit an invoice to receive revenue

26  payment for the Film from E-1, and Mainsail has not submitted such an invoice since 2014 or

27  earlier.  (PRSS at 68-69; Dkt. No. 118-8, Ex. RR at 7.)  The February 14 email sent from

28  Entertainment One to Maron Pictures confirms this practice.  The email clearly asks Maron Pictures

United States District Court
Northern District of California

to "provide an invoice for the amount due to" it.  (Dkt. No. 118-8, Ex. SS.)  This language indicates that Entertainment One's practice is to receive an invoice before sending royalty payments.  It also refutes plaintiff's theory that Mainsail conspired with Entertainment One to defraud plaintiff out of royalties.  On the contrary, it appears that Entertainment One is simply trying to pay plaintiff.

Therefore, the Court **GRANTS** Mainsail's motion for summary judgment as to all claims stemming from the Entertainment One email.

## IV.    CONCLUSION

The Court **GRANTS** defendants' motions for summary judgment on grounds that admissible evidence negates essential elements of all of plaintiff's claims.  The Court **DENIES** plaintiff's motions for summary judgment on claims that Mainsail committed copyright infringement, trafficking in counterfeit labels, omission fraud, and conversion.  The Court also **DENIES** plaintiff's claims that Apple and YouTube committed copyright infringement and vicarious copyright infringement.

Defendants shall each provide a form of judgment to the Court within ten business days. Plaintiff shall be provided an opportunity to comment on and/or approve the form of judgment. Plaintiff is advised that consenting to a "form" of judgment in no way impacts his rights to appeal the decision of this Court.

***

This terminates Docket Nos. 118,119, and 145 of Case No. 20-cv-01523; 146, 147, 153, 154, 155, 165, 168, 175, and 192 of Case No. 20-cv-01525; and 136, 137, 138, 139, 140, 143, 146, 152, 159, and 180 of Case No. 20-cv-01534.

**IT IS SO ORDERED**.

Date: May 8, 2024

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**