Mark Mahon
movieman1000@live.com
Mariners Rest,
Mariners View Avenue,
Passage West,
Cork,
Ireland
Tel: + 353 87 742 4444

*Plaintiff Pro Se*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK MAHON, AN INDIVIDUAL,<br><br>             Plaintiff,<br><br>    v.<br><br>MAINSAIL LLC., ET AL.,<br><br>             Defendants. | CASE NO. 4:20-cv-01523-YGR<br><br>**MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION ON THE ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| MARK MAHON, AN INDIVIDUAL,<br><br>             Plaintiff,<br><br>    v.<br><br>YOUTUBE LLC., ET AL.,<br><br>             Defendants. | CASE NO. 4:20-cv-01525-YGR<br><br>**MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION ON THE ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| MARK MAHON, AN INDIVIDUAL,<br><br>             Plaintiff,<br><br>    v.<br><br>APPLE, INC., ET AL.,<br><br>             Defendants. | CASE NO. 4:20-cv-01534-YGR<br><br>**MOTION FOR LEAVE TO FILE MOTION FOR RECONSIDERATION ON THE ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>JUDGE: HON. YVONNE GONZALEZ ROGERS |

**TABLE OF CONTENTS**

Page(s)

MEMORANDUM OF POINTS AND AUTHORITIES……………………………………… 1

   1. The Court's Ruling Unjustly Disregards Plaintiff's Individual Rights……………….. 2

   2. Mainsail *Never* had any Rights to copy Plaintiff's Masters under the SAA………….. 3

   3. Mainsail had *No Right* to change Plaintiff's Branded Cover under the SAA………… 4

   4. Mainsail *Never* had any Rights under the SAA to distribute the Show from and in North America, so all copies that were copied without Plaintiff's knowledge or consent were distributed as pirated copies, and remain so…………….. 6

   5. If Rights were transferred to the Show for the *Republic of Ireland* to Mainsail, then a Signed Record of the Amendment is required under the SAA……………..…….... 6

   6. Plaintiff trying to get His Basic Rights and Michael Madsen's Rights Recognized since January 30, 2010 is *Not* an explicit attempt to rewrite history…………….…… 8

   7. Plaintiff's Rights, as an Individual, are *Not* under Any Obligation to the SAA……... 9

   8. The Court's Judicial Estoppel Analysis Prejudices Plaintiff's Individual Rights…… 10

   9. Plaintiff Respectfully Asks for the Return of His Two Clean NTSC Master DVDs that were provided to Mainsail on July 30, 2009……………….………….. 12

CONCLUSION……………………………………………………………….............… 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Blanton v. Womancare, Inc.*,
    38 Cal.3d 396, 404 (1985)..................................................................................... 10

*Benasra v. Marciano*
    (2001) 92 Cal.App.4th 987, 990, 112 Cal.Rptr.2d 358............................................ 2

*Correia v. NB Baker Elec., Inc.*,
    32 Cal.App.5th 602, 622-23 (Cal. Ct. App. 2019)................................................... 2

*Fitzhugh v. Granada Healthcare & Rehabilitation Center, LLC*
    (2007) 150 Cal.App.4th 469, 474-475, 58 Cal.Rptr.3d 585.).............................. 2, 3

*Goliger v. AMS Properties, Inc.*
    (2004) 123 Cal.App 4th 374, 377, 19 Cal.Rptr.3d 819........................................... 2

*Grosset v. Wenaas*
    (2008) 42 Cal.4th 1100, 1108................................................................................. 2

*Hopkins v. Bonvicino*,
    2011 WL 995961, *1 (N.D. Cal. Mar. 21, 2011)..................................................... 1

*Linsk v. Linsk*,
    supra, 70 Cal.2d 272, 276 (1969)................................................................. 7, 8, 10

*Lone Ranger Television v. Program Radio Corp.*,
    740 F.2d 718, 722 (9th Cir. 1984)........................................................................... 5

*Media Rights Techs., Inc. v. Microsoft Corp.*,
    922 F.3d 1014, 1022 (9th Cir. 2019)............................................................. 3, 6, 10

*Navajo Nation v. Confederated Tribes and Bands of the Yahama Indian Nation*,
    331 F.3d 1041, 1046 (9th Cir. 2003)....................................................................... 2

*PacLink Communications Internat, Inc. v. Superior Court*
    (2001) 90 Cal.App.4th 958, 963.............................................................................. 2

*Polar Bear Prods, Inc. v. Timex Corp*,
    384 F.3d 700, 706 (9th Cir. 2004)........................................................................... 3

*Psihayos v. John Wiley & Sons, Inc.*,
    748 F.3d 120, 124 (2nd Cir. 2014).......................................................................... 3

*Russell v. Price*,
    612 F.2d 1123, 1128 n. 16 (9th Cir. 1979).............................................................. 5

# TABLE OF AUTHORITIES
## (continued)

Page(s)

**Cases**

*School District. No. 1J, Multnomah County, Or. V. ACandS, Inc.*,
    5 F.3d 1255, 1263 (9th Cir. 1993)……………………………………………………………… 1

*Silvers v. Sony Pictures Entertainment, Inc.*,
    402 F.3d 881, 884 (9th Cir. 2005)……………………………………………………… 11, 12

*Slyke v. Capital One Bank*,
    503 F. Supp. 2d 1353, 1366 (N.D. Cal. 2007)…………………………………………….. 2

*Walker v. Carnival Cruise Lines*,
    107 F. Supp. 2d 1135, 1137 (N.D. Cal. 2000)…………………………………………………. 2

**Statutes and Rules**

17 U.S.C. § 101, *et seq*………………………………………………………………………...…… 13

17 U.S.C. §106 (1)………………………………………………………………..……………….....3

17 U.S.C. §106 (2)………………………………………………………………………..……….....4

17 U.S.C. §106 (3)………………………………………………………………………..…………..6

Berne Convention Implementation Act of 1988….………………………………………………….9

Civil Local Rule 7-9…………………………………………………………………………….…... 1

**Treaty of the United States**

Berne Convention for the Protection
of Literary and Artistic Works (1886)…………........................................................……  9

TO THE COURT, AND ALL PARTIES AND TO THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that pursuant to Northern District of California Civil Local Rule 7-9(b)(1), Plaintiff Mark Mahon ("Plaintiff") hereby moves this Court for an order granting him leave to file a motion for reconsideration against defendants Mainsail LLC, et al. ("Mainsail")[1] ; YouTube LLC, et al. ("Google")[2] ; Apple Inc. et al. ("Apple")[3] (collectively, Mainsail; Google and Apple referred herein as "Defendants")[4] of this Court's May 8, 2024 Order Granting Defendant's Motion for Summary Judgment and Denying Plaintiff's Motion for Summary Judgment ("Order"). Dkt. No. 146. As required by Civil Local Rule 7-9, Plaintiff respectfully contends that "a material difference in fact … exists from that which was presented to the Court", as Plaintiff's presented his cases in a *personal* capacity.

## MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to Northern District Civil Local Rule 7-9, no motion for reconsideration may be brought without leave of court. *See* N.D. Civ. L.R. 7-9(a). A motion for reconsideration may be made on one of three grounds: (1) a material difference in fact or law exists from that which was presented to the Court, which, in the exercise of reasonable diligence, the party applying for reconsideration did not know at the time of the order; (2) the emergence of new material facts or a change of law; or (3) a manifest failure by the Court to consider material facts or dispositive legal arguments presented before entry of judgment. N.D. Civ. L.R. 7-9(b)(1)-(3). The moving party may not reargue any written or oral argument previously asserted to the Court. *Id*., 7-9(c). *See also Hopkins v. Bonvicino*, 2011 WL 995961, *1 (N.D. Cal. Mar. 21, 2011); *School District. No. 1J, Multnomah County, Or. V. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) ("Reconsideration

---

[1] Case no. 4:20-cv-01523-YGR names as defendants Mainsail LLC; Shoreline Entertainment, Inc.; Sam Eigen, an individual; Morris Ruskin, an individual (collectively "Mainsail".)

[2] Case no. 4:20-cv-01525-YGR names defendants YouTube LLC and Google LLC. (collectively, "Google".)

[3] Case no. 4:20-cv-01534-YGR names defendants Apple Inc.; Apple Inc. D/B/A iTunes; Apple Inc. D/B/A iTunes Store. (collectively "Apple".)

[4] Unless otherwise specified, Plaintiff references the docket with the lowest filing number. Where appropriate, Plaintiff directly references the other cases by name first, then the filing number.

is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law."). "Whether or not to grant reconsideration is committed to the sound discretion of the court." *Navajo Nation v. Confederated Tribes and Bands of the Yahama Indian Nation*, 331 F.3d 1041, 1046 (9th Cir. 2003). "To prevail on a motion to reconsider, a party must set forth facts or law of a strongly convincing nature to induce the Court to reverse its prior decision." *Slyke v. Capital One Bank*, 503 F. Supp. 2d 1353, 1366 (N.D. Cal. 2007) (citing *Walker v. Carnival Cruise Lines*, 107 F. Supp. 2d 1135, 1137 (N.D. Cal. 2000)).

### 1. *The Court's Ruling Unjustly Disregards Plaintiff's Individual Rights*

Plaintiff has worn six *separate* hats: (i) Maron Pictures Owner; (ii) *Strength and Honour* film, trailer and cover (collectively, the "Show") Copyrights Owner; (iii) Screenplay Copyright Owner; (iv) Writer; (v) Director; and (vi) Producer; all of which have *separate* and *individual* rights. Therefore, based on the current ruling, Plaintiff respectfully submits that the Court has effectively thrown out the baby with the bathwater and further exacerbates prejudice against Plaintiff's separate rights.

Plaintiff approached these cases as an individual due to Plaintiff revoking his rights from Maron Pictures on October 1, 2015. Whereas, Defendants asserted their Motions for Summary Judgment based on the Maron Pictures/Mainsail Agreement ("SAA") claiming it permitted their actions, thereby "a material difference in fact … exists from that which was presented to the Court" when in the exercise of reasonable diligence, Plaintiff did not know such fact, as he believed it *not* possible for the SAA to have standing based on Mainsail's state court position taken, and as the Appeal Court found no evidence of non-delivery. Furthermore, a legal entity is separate and apart from its individual members. *See PacLink Communications Internat, Inc. v. Superior Court* (2001) 90 Cal.App.4th 958, 963; and *Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1108. Moreover, "California law provid[es] that a person who signs an agreement in a particular capacity is not necessarily bound when acting in a different capacity." *Correia v. NB Baker Elec., Inc.*, 32 Cal.App.5th 602, 622-23 (Cal. Ct. App. 2019) (quoting *Goliger v. AMS Properties, Inc.* (2004) 123 Cal.App 4th 374, 377, 19 Cal.Rptr.3d 819 ; *Benasra v. Marciano* (2001) 92

Cal.App.4th 987, 990, 112 Cal.Rptr.2d 358 ; *Fitzhugh v. Granada Healthcare & Rehabilitation Center, LLC* (2007) 150 Cal.App.4th 469, 474-475, 58 Cal.Rptr.3d 585.) However, proceeding with his cases on this basis, Plaintiff respectfully submits he did not know such a fact that the SAA still had standing, which seems a complete contradictory position to Plaintiff, so is a good basis for this Court to grant Plaintiff's motion for reconsideration.

### 2. *Mainsail Never had any Rights to copy Plaintiff's Masters under the SAA*

Mainsail copied Plaintiff's property and all his master elements of the film in California without Plaintiff's knowledge or consent, as he only discovered between December 12 and 16, 2019, in violation of his copying rights as protected under Fed. R. Civ. P. 17 U.S.C. § 106 (1), which were *never* transferred to Mainsail by Maron Pictures in any capacity under any grant of rights through the SAA. The *only rights* that were assigned under the scope of rights of the SAA (Dkt. No. 118-3 at 38) is very clearly defined, as follows:

> 1. GRANT OF RIGHTS
>
> 1.1. Scope: Licensor grants to Sales Agent throughout the Territory [excluding North America and Ireland] the sole and exclusive right, license and privilege to license to distribute, as agent for and on behalf of the Licensor, the Show identified in item A of the Deal Terms section of this Agreement. This Grant of Rights shall also include the right to license the Show in all media, now known or hereinafter devised, including, but not limited to, theatrical, home video (including videocassette and videodisc), television (including free, satellite, cable, pay, pay-per-view and video on demand), cruise ships, airliners, the Internet and wide area computer networks such as the World Wide Web, in all languages and versions of the Show (the "License").
>
> 1.1.1. Sales Agent may grant, as part of a distribution deal, a traditional right of first negotiation and first refusal for the first sequel, prequel or remake on theatrical offers.

Plaintiff only discovered between December 12 and 16, 2019 that his separate master copies, which he supplied in good faith, had been copied without his knowledge or consent. Dkt. No. 19-5 at 60, 61. Under the "discovery rule" followed by the Ninth Circuit, a copyright claim accrues "when a party discovers, or reasonably should have discovered, the alleged infringement." *Media Rights Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1022 (9th Cir. 2019); *Polar Bear Prods, Inc. v. Timex Corp*, 384 F.3d 700, 706 (9th Cir. 2004) (same); *Psihayos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 124 (2nd Cir. 2014) (same). Mainsail also admitted the

"United States was a territory excluded from the Sales Agency Agreement" (Dkt. No. 119-51 at 53: 5-6) so these violations should be protected under law.

### 3.     Mainsail had No Right to change Plaintiff's Branded Cover under the SAA

If Mainsail had ceased and desisted with the counterfeit covers in January 30, 2010 (Dkt. No. 119-32), as instructed, which they did *not do*, despite testifying in state court that they did in 2016; then matters would have been resolved years ago. However, Mainsail had no right to publicly release derivative works of Plaintiff's film cover and/or trailer under the SAA. Moreover, Mainsail were provided a finished and branded Show, as part of Maron Pictures delivery of the finished product to be released. Dkt. No. 119-10. However, the SAA did *not* give Mainsail permission to change the Show they were provided. In fact, the SAA clearly states under changes (Dkt. No. 118-3 at 39):

> 6. CHANGES
> Sales Agent and its assigns shall have the right to dub or subtitle the Show and to add foreign language titles. Sales Agent and its assigns shall also have the right to cut or edit the Show for purposes of satisfying legal, broadcast or other distribution requirements. *No other* cuts or *re-arrangements shall be made without prior written approval by the Licensor*… Any changed version of the Show shall be incorporated in the definition of the "Show" hereunder and thereby subject to the terms of this agreement. (emphasis added).

Maron Pictures or Plaintiff *did not approve or see* the counterfeit cover until after it was released *without Plaintiff's knowledge or consent*, so therefore, Mainsail's version of the film was *never* incorporated or subject to the terms of the SAA. Moreover, their unauthorized cover indisputably violates Maron Pictures legal Screen and Advertising Statement of Restrictions (Dkt. No. 119-34), Plaintiff's rights (Dkt. No. 121-6 at 5) and Michael Madsen's rights, which Mainsail and its downstream sublicenses are legally required to adhere with.

Therefore, the derivative versions that were made from Plaintiff's masters in California which encompassed these elements, as Plaintiff only discovered between December 12 and 16, 2019 (Dkt. No. 19-5 at 60, 61), is a violation of his rights as protected by Fed. R. Civ. P. 17 U.S.C. § 106 (2), which were never transferred to Mainsail in any capacity under the scope of

rights transferred under the SAA (Dkt. No. 118-3 at 38), and which Mainsail have admitted the "United States was a territory excluded from the Sales Agency Agreement" (Dkt. No. 119-51 at 53: 5-6) so these are violations that law offers Plaintiff protection[5] for.

Accordingly, Plaintiff respectfully submits to this Court:

(i) When did Maron Pictures, the Licensor of the SAA, provide subsequent written approval to Defendants that Michael Madsen, the leading actor in the Show, could not appear on the cover for the Show's public release, when the cover of the Show was supplied, as part of delivery to Mainsail?

(ii) When did Maron Pictures, the Licensor of the SAA, provide subsequent written approval to Defendants that Vinnie Jones, the *supporting actor* in the Show, could appear alone on the cover in form and first position for the Show's public release?

(iii) When did Maron Pictures, the Licensor of the SAA, provide subsequent written approval that Mainsail, and its downstream sublicenses could change the award-winning, branded cover that was supplied, as part of delivery to Mainsail for the Show?

(iv) When did Maron Pictures, the Licensor of the SAA, provide subsequent written approval that Mainsail, and its downstream sublicenses could change the branded trailer that was supplied, as part of delivery to Mainsail for the Show's public release?

(v) When did Maron Pictures, the Licensor of the SAA, provide subsequent written approval that Mainsail, and its downstream sublicenses could globally refer to the award-winning, Irish Show, as a "Brit flick"?

---

[5] The protection of derivative rights extends beyond mere protection against unauthorized copying to include the right to make other versions of, perform, or exhibit the work. *Lone Ranger Television v. Program Radio Corp.*, 740 F.2d 718, 722 (9th Cir. 1984); *Russell v. Price*, 612 F.2d 1123, 1128 n. 16 (9th Cir. 1979).

(vi) When did Maron Pictures, the Licensor of the SAA, provide Mainsail subsequent written consent that it could copy Plaintiff's masters that he supplied Visual Data Media Services, Inc. ("Visual Data") in California in good faith on Mainsail's instruction under false pretenses?

Plaintiff humbly submits to this Court that unless all these questions can be answered and supported with explicit evidence, then the Court should grant Plaintiff's motion for leave to file motion for reconsideration.

4. ***Mainsail Never had any Rights under the SAA to distribute the Show from and in North America, so all copies that were copied without Plaintiff's knowledge or consent were distributed as pirated copies, and remain so.***

How can Mainsail distribute said copies, which Mainsail copied in California without Plaintiff's knowledge or consent and Plaintiff did not authorize or approve, again as he only discovered between December 12 and 16, 2019; in violation of his distribution rights as protected by Fed. R. Civ P. 17 U.S.C. § 106 (3), which Maron Pictures never transferred to Mainsail in any capacity for North America or the *Republic of Ireland*. It is the discovery of facts that start the statute. *Media Rights Techs.,* 922 F.3d at 1022. Furthermore, while Plaintiff accepts he was aware of Apple and Google selling his film in the *Republic of Ireland* in 2016, as long as every other person in Ireland, he did not discover that Apple had used it in California until February 22, 2023 (Apple, Dkt. No. 136-113 at 10: 22-24; at 13: 14-17), which they admitted, and that Google were using it in North America until March 17, 2023. Google, Dkt. No. 146-94 at 15: 10-13.

5. ***If Rights were transferred to the Show for the Republic of Ireland to Mainsail, then a Signed Record of the Amendment is required under the SAA***

Plaintiff respectfully disagrees with this Court's finding in relation to the *Republic of Ireland*, which were *never* transferred, formally or otherwise. When Maron Pictures had a

provisional discussion with Mainsail about these rights, it was made clear that Mainsail had to work under the scope of the rights assigned in the SAA but they could release it in Northern Ireland. The SAA clearly and indisputably states under clause 19.3 of the SAA:

> 19.3. This Agreement *cannot be changed or terminated orally and no amendments, modifications, or assignments hereof shall be binding upon either party* until accepted by a duly authorized agent or officer of the other party. *Fax signatures shall be deemed as valid for this Agreement and any amendments made hereto*. (emphasis added.) *See* Dkt. No. 118-3 at 45, 46.

Moreover, no agreement for modification was ever presented to Maron Pictures to include the *Republic of Ireland*, let alone signed for, including when Plaintiff had to get his Irish lawyers involved from October 13, 2010. Dkt. No. 143-1. In fact, the SAA was never amended either after being pointed out by Maron Pictures' Irish lawyers that they had issued the SAA with the incorrect legal name and it was required to be corrected so the title could be legally assigned. *Id*. Plaintiff also submits the emails the Court referenced, were communications that were made when Plaintiff *naively* believed that Mainsail had Maron Pictures best interest at heart and were operating *under the scope of the terms of the SAA* as legally required, so as a layman his use of language and words in some communications at that time was not precise due to the parties clear understanding that they were working within the confines of the SAA. He now knows that Mainsail never had any intention of paying Maron Pictures, and were concocting issues, as they did in the state court. Plaintiff also respectfully submits the Court has misinterpreted an email from Maron Pictures' *attorney* where he states "[Maron Pictures] want[s] to correct the DVD release in Ireland, and is willing to pay the cost of that including changing the art work." Dkt. No. 146 at 9: 27. While Plaintiff concedes Maron Pictures was prepared to leave matters go in the *Republic of Ireland* provided the covers were changed, *which they were not*, Maron Pictures was not going to pay them to correct *their* error after issuing counterfeit covers of the Show without Maron Pictures or Mark Mahon's consent or knowledge. Plaintiff cannot be held to account for Maron Pictures' attorney's action either. "Statements made by an attorney are not binding upon

1  the client unless the client has authorized the statements or subsequently ratified them." *Linsk v.*

2  *Linsk,* 70 Cal.2d 272, 276 (1969).

3        However, even assuming arguendo, that Plaintiff was prepared to accept the Court's

4  opinion on this, then it is *not* possible for Plaintiff to be bound to specific terms of the SAA, as

5  these rights were never formalized to be bound to the SAA, as is a legal requirement of the SAA.

6  *See* Dkt. No. 118-3 at 45, 46. Therefore, even when Plaintiff revoked his rights from Maron

7  Pictures on October 1, 2015, assuming the Court's position, none of the terms of the SAA can

8  apply thereafter. This is clearly a disputable issue.

      **6.**    ***Plaintiff trying to get His Basic Rights and Michael Madsen's Rights***

          ***Recognized since January 30, 2010 is Not an explicit attempt to rewrite history.***

      Although the Court's Order grants a judicial estoppel for Apple and Google and states

"[h]is change-in-course is an explicit attempt to rewrite history and retroactively revoke rights

from multiple entities that believe they had such rights" (Dkt. No. 146 at 12: 12-14); s*pecific*

rights that were *only* owned by Plaintiff, an individual, and which were *never* transferred to

Maron Pictures on September 25, 2006 (Dkt. No. 121-6 at 5) could *not* have been transferred to

Mainsail LLC in April, 2009 because certain specific rights were never transferred to Maron

Pictures under the scope of rights transferred to it in the first place by Mark Mahon. Therefore,

these rights *cannot* be licensed and *never* were licensed to Mainsail, and its downstream

sublicenses like Entertainment One et al.; Apple and Google. Furthermore, Plaintiff has not

attempted to rewrite history, as he has been screaming from the rooftops since January 30, 2010

trying to get his basic rights and Michael Madsen's rights recognized, which have been violated

on a continuous accrual basis but nobody wants to acknowledge it. Additionally, these specific

rights are guaranteed to be protected globally and have been directly violated in the United States,

and internationally on a continuous violation basis, in violation of international law and treaties,

namely the Berne Convention for the Protection of Literary and Artistic Works. The United States of America is equally at least, required to guarantee and observe these protections under federal copyright law in accordance with the Berne Convention Implementation Act of 1988.

### 7. *Plaintiff's Rights, as an Individual, are Not Under Any Obligation to the SAA*

During the hearing in the state court in 2016, Plaintiff heard for the first time the argument that Maron Pictures never completed delivery of the Show to Mainsail. For two and half full days, as an executive of Maron Pictures, Plaintiff was cross-examined in the stand by Mainsail's counsel trying to get Plaintiff to say that he never completed delivery, which Plaintiff refused to do, as it is not true. Plaintiff was so worn out from Mainsail's counsel gaslighting of him that Plaintiff was eventually reduced to tears on the stand during the third day over their counsel bullying Plaintiff to admit to something that was not so. In any evert, the state court still just wrote that Plaintiff stated Maron Pictures could not complete delivery, which Maron Pictures disputes, as common sense must dictate where else did Mainsail get Plaintiff's film from.

When Plaintiff filed the appeal on behalf of Maron Pictures, he then found out that the state court had no transcript of his testimony and that the state court had lost all of Maron Pictures evidence. Moreover, despite the appeal court refusing to then admit Maron Pictures' evidence, as Mainsail had objected to it, the appeal court stated there "was not clear error on the face of the record for the court to find nondelivery." Dkt. No. 31-19 at 28. Moreover, the evidence supports Maron Pictures completed delivery too. Dkt. No. 122-1 at 13; Fact 40.

In any event, if Maron Pictures did not complete delivery, as Mainsail alleges, then under the terms of the SAA, Mainsail did not have permission to sell Plaintiff's film, as the SAA states "Upon complete Delivery, Sales Agent will use commercially reasonable efforts to license the Show throughout the Territory [excluding North America and Ireland]." Dkt. No. 118-3 at 41. Therefore, if Maron Pictures had not completed delivery, as they claimed in state court, then

Mainsail had *no permission* to sell Plaintiff's film. Moreover, when Plaintiff only discovered that they had copied his masters in California between December 12 and 16, 2019 (Dkt. No. 19-5 at 60, 61), then any money that they made from these acts which they did *not* have permission to do, was made unlawfully. A copyright claim accrues "when a party discovers, or reasonably should have discovered, the alleged infringement." *Media Rights Techs.,* 922 F.3d at 1022.

### 8. *The Court's Judicial Estoppel Analysis Prejudices Plaintiff's Individual Rights*

Although, the Court states Plaintiff is judicially estopped, Plaintiff respectfully submits that the Court's analysis has thrown the baby out with the bathwater. The Court notes in 2016 that Maron Pictures repeatedly represented to the California state courts that it (not plaintiff Mahon) owned the rights to the Film. Indeed, it cites and relies on "declaration to the Superior Court in 2016 in Mahon's name stating that "Maron Pictures owns the rights to" the Film" and cites "Maron Pictures' appellate reply brief representing that S&H was Maron Pictures' "intellectual property"". Dkt. No. 146 at 11: 2-5.

*Firstly*, this Court was made aware that Plaintiff *never* approved or signed that declaration in 2016, which is an obvious forgery and in fact, did not see it until Mainsail presented it to the Court on April 10, 2020. Dkt. Nos. 25-15; 26-1 at 2, ¶ 8. "Statements made by an attorney are not binding upon the client unless the client has authorized the statements or subsequently ratified them." *Linsk,* supra, 70 Cal.2d 272 at 276.

*Secondly*, the appellate reply brief that was filed for Maron Pictures was drafted and filed by a legal professional, Suzanne R. Natbony, Esq. (265965), *not* Plaintiff; "An attorney is not authorized, by virtue of his general retention in litigation, to 'impair the client's substantial rights or the cause of action itself.'" *Blanton v. Womancare, Inc.*, 38 Cal.3d 396, 404 (1985).

*Thirdly*, Plaintiff signed a declaration with the Appellate Court on April 10, 2017, as *per their* request, where Plaintiff confirmed that *he is* personally the copyright owner. Dkt. No. 31-24

at 2.

Although the Court suggests Plaintiff correcting a "filing error" in the copyright's registration from Maron Pictures to himself is "dubious at best" (Dkt. No. 146 at 11: 8), any reasonable mind must conclude that it was a genuine filing error as Plaintiff's Copyright Certificate of Registration issued on March 8, 2006, clearly lists the "Author" as Mark Mahon. Dkt. No. 121-7. Therefore, the fact that the Maron Pictures Copyright Certificate of Registration lists the Author as Maron Pictures, indisputably shows this is an error, as it was required to show Mark Mahon. Dkt. No. 121-8 at 2. Moreover, the fact that the postal address shows Maron Pictures name where an individual's name goes, and Mark Mahon's name where the company name goes on the address further demonstrates this inadvertent error. Dkt. No. 121-8 at 3.

While Plaintiff concedes in hindsight his letter to the Copyright Office that states "I confirm that my dispute with my company, Maron Pictures, has now been resolved" could have been better worded (Dkt. No. 146 at 11: 17-18), Plaintiff *vehemently* denies and disputes he tried to mislead anyone, as once the Appeal Court *had dismissed* Maron Pictures appeal on April 19, 2017 due to it rejecting Plaintiff's argument about having any standing as the 100% owner of Maron Pictures (Dkt. No. 130-11 at 2); then as far as Plaintiff was personally concerned, his efforts on behalf of Maron Pictures *were finished*, as he had previously revoked his own agreements on October 1, 2015. Plaintiff has now only learned through this process, the importance of clear, precise language. In any event, he also has a valid Copyright Certificate of Registration for *Strength and Hono[u]r* issued on March 8, 2006 that clearly lists him as the "Author". Dkt. No. 121-7. Moreover, Plaintiff is also the legal and beneficial owner of the Maron Pictures copyright. Dkt. No. 121-8. "To be entitled to sue for copyright infringement, the plaintiff must be the "legal or beneficial owner of an exclusive right under a copyright." *See* 4 *Business and Commercial Litigation in Federal Courts,* at 1062, § 65.3(a)(4) (Robert L. Haig ed.)" *Silvers*

*v. Sony Pictures Entertainment, Inc.*, 402 F.3d 881, 884 (9th Cir. 2005).

### 9. Plaintiff Respectfully Asks for the Return of His Two Clean NTSC Master DVDs that were provided to Mainsail on July 30, 2009.

Plaintiff respectfully disagrees that the DVDs 626 and 627 presented by Mainsail to the Court are the ones that were sent to Visual Data in September, 2009, and they were *not* made with Plaintiff's permission in 2009. In fact, Plaintiff only discovered that Mainsail had actually produced copies on their own equipment when they presented this to the Court on October 31, 2023. The only DVD that Plaintiff was aware of in 2009 before the digital elements were completed was an unfinished, rough telecine *guide* version of the film, which Maron Pictures supplied Mainsail as they initially requested, with the understanding that they would only show clips from it, as it was *not* a finished master of the Show. However, two finished master NTSC DVDs were supplied to Mainsail on July 30, 2009 (Dkt. No. 119-5), and it is Plaintiff's position that these are the two NTSC masters that were subsequently sent to Visual Data, who in fact confirmed during their deposition, that Visual Data could *not* confirm that the 626 and 627 DVDs that Mainsail presented as evidence were in fact the discs they sent to Mainsail's offices in 2017. In any event, Plaintiff requests that his two NTSC Master DVDs that were supplied to Mainsail are now returned to Plaintiff, as he has not received them back and wants his property returned.

While the Court states "defendants showed the DVDs contents, in the form of a trailer, to plaintiff on May 9, 2009, and plaintiff commented on the trailer" (Dkt. No. 146 at 14), Mainsail *never* provided Maron Pictures or Plaintiff with any DVD ever, only an online link for a thirty-second trailer that they told Maron Pictures would *only* be seen by industry buyers, and was *not* for public use or release, as Plaintiff was supplying Mainsail with a completed and costly, branded trailer as part of his delivery of the Show for public use. *See* Dkt Nos. 121-13 at 4, 7; 119-11; 126.

## **CONCLUSION**

For the foregoing reasons, Plaintiff most humbly requests the Court grant him leave to file a motion for reconsideration, as there is good cause. After such an arduous and long journey, Plaintiff's separate and individual rights should be at least acknowledged by this Court and protected under federal copyright law 17 U.S.C. §§ 101, *et seq.*, as Plaintiff respectfully submits the consequences of the existing Order is detrimental for *all* copyright owners and holders.

Dated: May 20, 2024

Respectfully submitted,

By: _____
Mark Mahon
movieman1000@live.com
Mariners Rest,
Mariners View Avenue,
Passage West,
Cork,
Ireland
Telephone: + 353 87 742 4444

*Plaintiff Pro Se*